Sims et al. v. Thompson, Ad.

---

## Sims et al. v. Thompson, Ad.

| | |
|---|---|
| 39 | 301 |
| 60 | 479 |
| 39 | 301 |
| 65 | 359 |
| 39 | 301 |
| 66 | 385 |
| 39 | 301 |
| 77 | 108 |

HOMESTEAD: *Tenant in common; mortgage of homestead.*
   A tenant in common is entitled to a homestead in the estate in common, and during the life of the Constitution of 1868, which prohibited a mortgage upon the homestead except for the purchase-price and other specified debts, a tenant in common purchasing his co-tenant's interest, could not, for the purchase-price, mortgage the whole tract on which was his homestead, but only the interest purchased.

CROSS-APPEALS from *Phillips* Circuit Court, in chancery.

Hon. J. N. CYPERT, Circuit Judge.

*Tappan & Hornor*, for appellants:

C. B. Sims, being a married man and head of a family, had a homestead of 160 acres, which, under the Constitution of 1868, he could not mortgage or otherwise incumber. (*Greenwood & Son v. Maddox & Toms, 27 Ark., 648.*) Even if he agreed to mortgage the entire place, he had not the lawful right and power to do so. He mortgaged all he could, including the most valuable improvements. A promise to mortgage creates no lien, and if it did, there was no consideration for such a promise.

*John C. Palmer*, for appellee :

The homestead right is a derivative one, and if the husband was not entitled, the widow and children could not be, and vice versa. *Johnson Heirs v. Turner, admr., 29 Ark., 280.*

The debt was for the purchase-money of the land. (*Gantt's Digest, sec. 2214.*) C. B. Sims was not a purchaser for valuable consideration without notice. He took the land subject to all equities which attached to it in the hands of his father. He agreed to hold the land subject to the purchase-money debt, which agreement was to be evidenced by execution of the mortgage, and the mortgage stands, in equity, as though it had been executed for the whole place.

The widow only entitled to dower in an undivided half of the 160 acres omitted, because the legal title in the second undivided half was conveyed to C. B. Sims by his father upon the distinct agreement that it should be held by him subject to the payment of $4,000 debt. He was a trustee to that extent, and this was a trust estate.

SMITH, J. William A. Sims and his son, Charles B., were tenants in common of the Crawford plantation in

Phillips County, Arkansas, containing 320 acres, and also of other lands near said plantation, each owning an undivided half interest. The father resided in South Carolina, the son upon said place. The father was indebted to one of his neighbors, Thompson by name, for borrowed money. In 1869 an accounting was had between them, Charles B. being present, and the amount of the debt was fixed at $4,000. It was arranged that Charles B. should assume this debt, and he made his note to Thompson for this sum, payable at one day, with his father as surety. The consideration for this promise was, that his father should convey to him his estate in the Arkansas lands. Charles B. further agreed, upon his return to Arkansas, to execute, place upon record, and transmit to Thompson a mortgage upon the Crawford place to secure payment of his note. This agreement originally rested in parol; but in 1871, after he had received the conveyance from his father, he wrote a letter to Thompson, in which he stated that he would go to Helena in a few days and cause a mortgage on the Crawford place to be prepared and recorded. Shortly thereafter he and his wife did execute, acknowledge and deliver a mortgage upon 320 acres of land. But 160 acres of the Crawford tract were left out of the mortgage, and an equal quantity of the other lands, which were of less value, was substituted. Thompson never discovered the variation, but died in the belief that he held a mortgage upon the entire Crawford place. Such was also the impression of William A. Sims until after his son's death.

Thompson's administrator exhibited this bill against the administrator, widow and infant heirs of Charles B. Sims for reformation of the mortgage, and for foreclosure of it as reformed. The Circuit Court decreed according to the prayer of the bill, subject to the widow's dower in the land not described in the mortgage. Both parties have appealed.

The omission of one tract and the substitution of another was not the result of accident or mistake, but of design. Sims and his wife had conferred upon the subject, and she had insisted upon the reservation of a homestead out of the Crawford place. His subsequent conduct in abandoning the quarter upon which his dwelling, gin-house and the greater portion of the cleared land were situated, and taking up his residence on the lands not embraced in the ' mortgage, evinces his determination to violate his agreement. Good faith demanded that he should advise Thompson of his change of purpose. But this, it seems, was never done.

It is laid down in some of the text-books and in some adjudicated cases that the jurisdiction of chancery to correct deeds and other written instruments is limited to cases of mutual mistake. We will assume for the purposes of this case that it extends also to cases of mistake on one side and fraud on the other. *Wells v. Yates, 44 N. Y., 525.*

We will also assume that Sims' oral promise to mortgage was sufficiently reinforced by his subsequent letter to take the case out of the operation of the statute of frauds. Also we take for granted that a past consideration and one which did not move directly from Thompson was sufficient to support such a promise; and that the debt for which Charles B. Sims made his note to Thompson represented the purchase-price which the maker agreed to pay for his father's interest in the lands.

HOMESTEAD Mortgage of by tenant in common. It is a maxim that equity regards that which is agreed to be done as already performed. But obviously this must be understood of such things as it is lawful for a man to do. Charles B. Sims could not lawfully incumber the whole of the Crawford place, because he was a married man and the head of a family. There was his home, and others, besides himself, had an interest in that home. By

the Constitution then in force he was absolutely prohibited from mortgaging his homestead, except for a few specified debts. (*Constitution of 1868, article 11, sec. 2.*) He was entitled to a homestead, notwithstanding his estate was a tenancy in common, and had never been severed from that of his father, at the date of his agreement. *Greenwood & Son v. Maddox & Toms, 27. Ark., 648.*

And at the time of the execution of the mortgage he was the owner of the whole estate and forbidden to charge his homestead with any debt not belonging to one of the enumerated classes.

It is indeed argued that the $4,000 note represented purchase-money and did not fall within the prohibition of the Constitution. The fallacy of this reasoning lies in confounding a debt contracted in the purchase of a part with a debt contracted in the purchase of the whole. The debt was in a certain sense a purchase-debt; that is, the consideration was the sale to the son of the father's estate. And to that extent Charles B. Sims might mortgage, or be decreed to mortgage, what he acquired by his last purchase. But he had a prior estate in the lands which could not be so pledged.

Under the agreement, construed with reference to our constitutional provision, the creditor was entitled to demand from Sims a mortgage upon one undivided half of the Crawford place. He already has a mortgage of the whole interest in the more valuable part of that farm, besides a mortgage upon other lands not contemplated in the agreement, with a relinquishment of dower on the part of the mortgagor's wife. He has therefore received all the security that his debtor could legally have given him.

We may add that the same result would have followed if Sims had executed the mortgage on the Crawford place pursuant to the agreement. The mortgagee would

not have been permitted to foreclose as against the homestead estate. To that extent it would have been void.

On supposing all the parties to be still alive, and that Sims had refused to execute any mortgage at all, a court of equity should have· charged only the undivided half interest acquired by the last purchase with the payment of this debt.

The decree below is reversed and the cause remanded with directions to enter up a decree of foreclosure only as to the lands described in the mortgage and to deny the prayer for reformation.